UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>SABINA KARGAR, <em>et al.</em>, <em>individually and on behalf of all others similarly situated</em>,<br><br>Plaintiffs,<br><br>-against-<br><br>UMITJON KAMOLOV, et al.<br><br>Defendants.</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/16/25__

22-CV-00664 (JMF) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. JESSE FURMAN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs Sabina Kargar, Sergio Perez Diaz, and Shania Foster are former employees of Farida, a Central Asian/Uzbekistani restaurant located at 498 9th Avenue in Manhattan, owned and operated by defendants Farida Gabbassova-Ricciardelli and Umitjon Kamolov (together, the Individual Defendants), allegedly as part of an "enterprise" of related entities, including defendants FV Com Corporation d/b/a Farida (FV Com), Farida Group Corp. (Farida Group), Umka Puff Pies (Umka), and Farida Online Kitchen a/k/a Farida Authentic Delicious Food 24/7 (Farida Online) (together, the Corporate Defendants). Plaintiffs brought this action to seek damages for unpaid minimum and overtime wages, unpaid spread of hours pay, unlawfully withheld tips, and related relief pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and N.Y. Labor Law (NYLL) § 190 *et seq.* Additionally, plaintiff Kargar seeks compensatory and punitive damages against defendant Kamolov for subjecting her to sexual harassment in violation of the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code § 8-107 *et seq.*

All six defendants appeared, filed answers, and participated in discovery. But on February 23, 2023, defendants' counsel was granted leave to withdraw from representing defendant Kamolov on the ground that Kamolov had left the country with no intention of returning. Thereafter, plaintiffs filed a motion for a default judgment against Kamolov, which was granted

by the Hon. Jesse M. Furman, United States District Judge, on May 5, 2023. On October 30, 2023, the remaining parties notified the Court that plaintiffs had settled their claims against Individual Defendant Gabbasova-Ricciardelli and Corporate Defendants FV Com and Farida Group. The following day, the District Judge referred the case to me for an inquest into damages as to Kamolov (hereinafter, the Defaulted Defendant).

I have now conducted that inquest and conclude, for the reasons that follow, that plaintiff Foster should be awarded damages against the Defaulted Defendant in the aggregate amount of $49,525 on her claims for unpaid minimum and overtime wages, unpaid spread of hours pay, and unlawfully withheld tips, all under the NYLL. Plaintiff Kargar should be awarded damages against the Defaulted Defendant in the aggregate amount of $78,300 on her claims for unpaid overtime wages, unpaid spread of hours pay, and unlawfully withheld tips under the NYLL, as well as her claims for sexual harassment under the NYCHRL. Plaintiff Diaz never provided any admissible evidence that could be used to support his request for damages, and consequently should not be awarded damages in any amount. Finally, attorneys' fees should be awarded against the Defaulted Defendant in the amount of $11,611.88.

## I.    BACKGROUND

### A.    Factual Allegations

At various times from 2020 to 2022, plaintiffs worked as servers, bartenders, runners/bussers and kitchen staff at FV Com, doing business as "Farida," a Central Asian/Uzbekistani restaurant located in New York City. Second Amended Complaint (SAC) (Dkt. 73) ¶¶ 3, 15. Plaintiffs allege that FV Com was part of an "enterprise" of related entities – including the remaining Corporate Defendants – all sharing "common ownership, management, branding, web presence, menus, recipes, and other resources," and all "operated together as a single business enterprise." *Id.* ¶¶ 15-24, 28-29, 47-49. The Individual Defendants owned and operated the

2

Corporate Defendants, set their payroll policies, and "acted intentionally in their direction and control of Plaintiffs." *Id*. ¶¶ 25-26, 30.

Plaintiff Kargar was employed as a waitress, bartender, food runner, cleaner, and kitchen staff member at Farida from July 2020 to April 2021. SAC ¶¶ 52-53. She alleges that she typically worked six days per week, for at least 12.5 hours per day, amounting to approximately 78 hours per week. *Id*. ¶ 53. She was paid $120 per day worked, with no tips. *Id*. ¶ 54. Kargar also alleges that she was sexually harassed by the Defaulted Defendant, resulting in emotional distress. *Id*. ¶¶ 111-127. Throughout her employment at Farida, Kamolov "made sexist comments" about Kargar and women generally. *Id*. ¶ 112. He commented on Kargar's "physique, loudly stating in front of customers and staff that she is a 'hot bitch' and has a 'tight body.'" *Id*. Additionally, "[o]n more than one occasion during the course of plaintiff Kargar's employment, Kamolov would approach [Kargar] from behind, place his arms underneath hers and grab her breasts." *Id*. ¶ 113.

Plaintiff Foster was employed as a server at Farida from June 1, 2021 to July 19, 2022. SAC ¶ 62. She alleges that she usually worked five days per week ("but sometimes 6 and sometimes 4 days"), for approximately 12.5 hours per day. *Id*. ¶ 64. Foster's wage was initially $120 per day, but later increased to $200 per day. *Id*. ¶ 67. Though her pay scheme was "described as a day rate plus tips," she "did not receive the tips that she should have." *Id*. ¶¶ 66, 68.

Plaintiff Diaz was employed as a dishwasher, busboy, waiter, and kitchen staff member at Farida from October 2020 to April 2021. SAC ¶ 57. He alleges that he worked six days per week, for at least 12.5 hours per day, amounting to approximately 78 hours per week. *Id*. ¶ 58. He was initially paid a flat weekly rate of $400 in cash, with no tips. *Id*. ¶ 59. His weekly rate was later raised to $500, with no tips, and then to $600, still with no tips. *Id*.

3

Both Kargar and Diaz allege that they observed the Individual Defendants "take and keep all cash left by customers as tips." SAC ¶¶ 55, 60. They further allege that no "credit card tips were ever dispersed" to any employee. *Id*. Both Kargar and Diaz allege they received their wages entirely via Zelle, without a paystub or any breakdown of hours worked. *Id*. ¶¶ 54, 60. Foster similarly alleges that she did not receive tips, overtime pay, paystubs, or spread of hours pay. *Id*. ¶¶ 68-71. Both Kargar and Diaz allege they were typically unable to take breaks, and that when they did, their breaks would last only 15-20 minutes. *Id*. ¶¶ 56, 61.

### B.      Procedural History

Plaintiffs Kargar and Diaz filed their initial Complaint on January 25, 2022, against the Individual Defendants, FV Com, UMKA, and Farida Online. (Dkt. 1.) On February 11, 2022, all of the defendants named in the Complaint appeared through a single attorney, Jacob Aronauer, Esq., and on March 16, 2022, they answered the Complaint. (Dkts. 21, 24.) On November 29, 2022, plaintiffs filed their First Amended Complaint, adding Foster as an additional plaintiff. (Dkt. 59.) On December 15, 2022, with leave of the Court (*see* Dkt. 72) plaintiffs filed the SAC, which remains their operative pleading, and which names Farida Group Corp. as an additional Corporate Defendant.

### 1.      Collective Certification Motion

On December 2, 2022, plaintiffs filed a motion for conditional certification of an FLSA collective pursuant to 29 U.S.C. § 216(b) (Dkt. 61), supported by declarations from plaintiffs Kargar (Kargar Coll. Cert. Decl.) (Dkt. 64) and Foster (Foster Coll. Cert. Decl.) (Dkt. 65). On December 21, 2022, the District Judge granted that motion and approved plaintiffs' proposed form of notice. (Dkt. 77.) However, no additional plaintiffs ever opted in to this action.

4

### 2. Withdrawal Motion

On January 5, 2023, all six defendants answered the SAC. (Dkt. 78.) But on February 10, 2023, attorney Aronauer moved to withdraw as counsel for defendant Kamolov on the ground that there had been a "communication breakdown" in the attorney-client relationship after Kamolov returned to his "native country in eastern Europe," without any intention of returning to the United States, and without informing counsel of his plans. (Dkt. 83.) On February 23, 2023, after service of the withdrawal motion on Kamolov (Dkts. 85-86), Judge Furman granted counsel's motion to withdraw. (Dkt. 90.) On February 28, 2023, attorney Aronauer served Kamolov with the order granting his withdrawal motion. (Dkt. 91.) Kamolov has done nothing, since then, to defend the claims against him.

### 3. Default Motion

On April 4, 2023, plaintiffs filed a motion for a default judgment against Kamolov (Dkt. 104), supported by an attorney declaration (Dkt. 105) attaching multiple exhibits, including a four-page damages calculation, prepared by counsel, totaling $553,536.70 for all three plaintiffs. (Dkt. 105-10.) On April 5, 2023, Judge Furman scheduled a show cause-hearing on the default motion for April 26, 2023 (Dkt. 106), and on April 6, 2023, plaintiffs served their default motion papers on Kamolov, by email, together with the scheduling order. (Dkt. 109.)

On April 6, 2023, plaintiffs filed supplemental motion papers, including declarations signed by plaintiffs Kargar (Kargar Default Decl.) (Dkt. 110) and (Foster Default Decl.) (Dkt. 112), and two attorney declarations (Dkts. 111, 113), one of which attached multiple exhibits, including a five-page damages calculation, prepared by counsel, totaling $870,795.70 for all three plaintiffs. (Dkt. 113-10.) Plaintiffs served their supplemental papers on Kamolov, by email, on April 7, 2023. (Dkt. 114.) Thereafter, the District Judge adjourned the show-cause hearing several

times, ultimately scheduling it for May 5, 2023, by telephone. (Dkts. 123, 128, 130.) Plaintiffs served each of these orders on Kamolov by email. (Dkts. 126, 129, 131.)

Kamolov failed to respond to the default motion or appear for the show-cause hearing. Consequently, on May 5, 2023, Judge Furman granted the motion, struck Kamolov's answer to the SAC, and entered a default judgment against him "as to liability (and liability only)," reserving judgment as to damages "pending further proceedings." (Dkt. 132.). The case then continued against the non-defaulted defendants.

### 4.    Partial Settlement

On September 22, 2023, after a settlement conference before the undersigned Magistrate Judge, plaintiffs agreed to settle their claims against Gabbassova-Ricciardelli, FV Com, and Farida Group. (*See* Dkt. 164.) On October 30, 2023, they submitted a letter-motion seeking judicial approval of their settlement (the Settlement) pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). (Dkt. 171.) On November 9, 2023, after the settling parties consented to my jurisdiction for this purpose (Dkt. 173), I approved the Settlement and dismissed plaintiffs' claims against Gabbassova-Ricciardelli, FV Com, and Farida Group (the Settled Defendants). *See* Cheeks Order (Dkt. 178) at 5-6.

 The Settled Defendants agreed to pay plaintiffs a total of $70,000, in installments. *See* Cheeks Order at 2. Of that sum, $14,000 was allocated to each plaintiff; $14,000 was allocated to the Law Offices of Ilya Fishkin, which represented plaintiffs Kargar and Diaz before Foster joined the litigation; and $14,000 was allocated to AndersonDodson, P.C. (AndersonDodson), which represented plaintiff Foster (and later became co-counsel for Kargar and Diaz). *Id*. at 2, 4-5.[1]

---

[1] Defendants Umka and Farida Online were not parties to the Settlement. That may be because these defendants (unlike FV Com and Farida Group) do not exist in corporate form. Rather, plaintiffs allege, they are "unincorporated business entit[ies] and/or partnership[s] and/or sole proprietorship[s]" operated out of the same premises as Farida.  SAC ¶¶ 18-19. Although plaintiffs

6

### 5.      Damages Inquest

On October 31, 2023, Judge Furman amended my reference to include the damages inquest as to the Defaulted Defendant. (Dkt. 174.) On November 9, 2023, I issued a Scheduling Order (Sched. Order) (Dkt. 179) directing plaintiffs to submit proposed findings of fact and conclusions of law concerning their damages as against the Defaulted Defendant, together with supporting evidentiary materials, by November 30, 2023. Sched. Order ¶ 2. I specifically instructed plaintiffs to support their proposed findings with "one or more declarations or affidavits, which may attach and authenticate any documentary evidence needed to establish the proposed damages. All evidence submitted in support of plaintiffs' request for damages or other relief must be in admissible form." *Id*. ¶ 2. Additionally, I required plaintiffs to serve their inquest materials on the Defaulted Defendant, together with a copy of the Scheduling Order. *Id*. ¶ 7.

After obtaining one extension (Dkt. 181), plaintiffs filed their Proposed Findings of Facts and Conclusions of Law (Prop. Findings) (Dkt. 184) on December 15, 2023, supported by a declaration signed by one of their attorneys, Penn Dodson (Dodson Decl.) (Dkt. 183), attaching sixteen exhibits. (Dkts. 183-1 to 183-16.) Many of these exhibits are copies of the supplemental default motion papers that plaintiffs previously filed on April 6, 2023 – including the Kargar Default Declaration and the Foster Default Declaration. (*See* Dkts. 183-12 and 183-14.) Plaintiffs served these materials upon the Defaulted Defendant by postal mail and email, along with the Scheduling Order, on December 22, 2023. (Dkt. 186.) The Defaulted Defendant did not respond.

Plaintiffs now request a total of $81,044.18 in "back pay," including unpaid minimum wages, unpaid overtime, withheld tips, and unpaid spread of hours pay for all three plaintiffs;

---

have never formally dismissed their claims against Umka and Farida Online, they have made no efforts, since the Settlement, to pursue them.

another $81,044.18 in liquidated damages; and $30,000 in statutory penalties for failure to provide the wage statements and notices required by NYLL §§ 195(1) and 195(3). Prop. Findings at 22; Dodson Decl. ¶ 91. In addition, plaintiff Kargar seeks $138,986.70 in "compensatory damages," $35,000 in emotional distress damages, and $50,000 in punitive damages with respect to her NYCHRL claims. Prop. Findings at 22; Dodson Decl. ¶ 92. Finally, as discussed in more detail in Part V(E), *infra*, plaintiffs appear to request $51,444 in attorneys' fees and costs. Dodson Decl. ¶¶ 93, 95.

Plaintiffs did not request an evidentiary hearing as to their damages. To the contrary: their counsel asserts that no hearing is necessary because plaintiffs have "supported their request for damages with sworn declarations." 4/6/23 Dodson Decl. (Dkt. 113) ¶ 28. Consequently, I have conducted the inquest based solely upon the declarations and other written materials submitted by plaintiffs. *See Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Construction, LLC*, 779 F.3d 182, 189 (2d Cir. 2015) (Fed. R. Civ. P. 55(b)(2) "allows but does not require the district judge to conduct a hearing.") (quoting *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991)).

## II.    JURISDICTION AND VENUE

I am satisfied that this Court has subject-matter jurisdiction over plaintiffs' claims. Because plaintiffs sue under a federal statute – the FLSA – subject-matter jurisdiction is properly based on 28 U.S.C. § 1331. To the extent plaintiffs have adequately pleaded state law claims arising out of the same facts and circumstances, the Court may exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

I am also satisfied that this Court has personal jurisdiction over the Defaulted Defendant, which is a "a necessary prerequisite to entry of a default judgment." *Reilly v. Plot Commerce*, 2016 WL 6837895, at *2 (S.D.N.Y. Oct. 31, 2016) (quoting *Sheldon v. Plot Commerce*, 2016 WL

8

5107072, at *6 (E.D.N.Y. Aug. 26, 2016), *adopted*, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016)). At all relevant times Kamolov was an "owner and operator" of Farida, which is located in New York City, and is where he committed all of the conduct for which he was sued. SAC ¶¶ 17-27, 55, 60, 74-81, 83-85, 88, 91, 94, 97, 100, 103, 106, 111-113. Moreover, Kamolov appeared in this action through counsel, answered the SAC, and participated in discovery (for a time), thereby waiving any argument regarding personal jurisdiction. *See* Fed. R. Civ. P. 12(h)(1)(B); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999) (defendant who "participated in pretrial proceedings but never moved to dismiss for lack of personal jurisdiction" forfeited the defense).

## III.    STATUTE OF LIMITATIONS

The statute of limitations under the FLSA is two years, 29 U.S.C. § 255(a), unless the violations were "willful," in which case the limitations period increases to three years. *Id*. Here, plaintiffs allege willfulness only generally. *See, e.g.*, SAC ¶¶ 30, 51, 84, 91, 94, 97, 100, 103, 106. However, Kamolov's default, "in itself, may suffice to support a finding of willfulness." *Gonzalez Mercedes v. Tito Transmission Corp.*, 2018 WL 7291452, at *4 (S.D.N.Y. Dec. 6, 2018) (quoting *Santillan v. Henao*, 822 F. Supp. 2d 282, 297 (E.D.N.Y. 2011)), *adopted sub nom. Mercedes v. Tito Transmission Corp.*, 2019 WL 102007 (S.D.N.Y. Jan. 4, 2019); *see also Elisama v. Ghzali Gourmet Deli Inc.*, 2016 WL 11523365, at *11 (S.D.N.Y. Nov. 7, 2016) ("[B]y virtue of their default, Defendants may be considered willful violators of the FLSA[.]"), *adopted*, 2018 WL 4908106 (S.D.N.Y. Oct. 10, 2018). Therefore, the applicable statute of limitations is three years. The statute of limitations under the NYLL is six years, regardless of willfulness. NYLL § 198(3). Here, plaintiffs seek compensation for work performed less than three years before they filed (or joined) this action, making their claims timely under both the FLSA and the NYLL.

The statute of limitations for plaintiff Kargar's claims under the NYCHRL is three years, calculated from the date of the "alleged unlawful discriminatory practice or act of discriminatory

harassment[.]" N.Y.C. Admin. Code § 8-502(d); *see also Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) ("[C]laims under the . . . NYCHRL are time-barred unless filed within three years of the alleged discriminatory acts[.]"). All of Kamolov's alleged misconduct occurred during Kargar's employment, less than three years before she filed this action. Accordingly, those claims are also timely.

## IV.    LIABILITY

### A.    Legal Standards

Following a default, all well-pleaded factual allegations in the complaint as to liability are "deemed admitted[.]" *S.E.C. v. Razmilovic*, 738 F.3d 14, 19 (2d Cir. 2013), *as amended* (Nov. 26, 2013); *accord City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). However, a default "only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendants." *Gesualdi v. Quadrozzi Equip. Leasing Corp.*, 629 F. App'x 111, 113 (2d Cir. 2015) (summary order). The court must therefore determine "whether the allegations in a complaint establish the defendants' liability as a matter of law." *Id.* (citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)). If the well-pleaded factual allegations establish the defaulting party's liability, the only remaining issue is "whether Plaintiff has provided adequate support for the [requested] relief[.]" *Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).

Conversely, if the well-pleaded factual allegations in the complaint fail to state a claim upon which relief can be granted, no damages can be awarded, even if the post-default inquest submissions supply the missing information. *See United States ex rel. Nat'l Dev. & Constr. Corp. v. U.S. Envtl. Universal Servs., Inc.*, 2014 WL 4652712, at *4 (S.D.N.Y. Sept. 2, 2014) ("'[i]t is the . . . [c]omplaint, not the inquest submissions, that establishes defendants' liability") (alteration

10

in original) (quoting *Gutman v. Klein*, 2010 WL 4975593, at *10 (E.D.N.Y. Aug. 19, 2010)); *J & J Sports Prods., Inc. v. Abdelraouf*, 2019 WL 457719, at *2 (E.D.N.Y. Feb. 5, 2019) ("It is the moving party's burden to demonstrate that it is entitled to recovery based on the factual allegations pleaded in the complaint.").

## B. Unpaid Minimum, Overtime, and Spread of Hours Wages, and Unlawful Tip Retention

To state an FLSA wage claim, plaintiffs must allege (1) that there existed between plaintiffs and defendants an employee-employer relationship; (2) that their work involved interstate commerce; and (3) for claims involving unpaid wages, the hours worked for which wages were not received. *Zhong v. Aug. Aug. Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007). If the claim is for overtime compensation, the plaintiff "must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013).

Claims for unpaid wages pursuant to the NYLL involve a similar analysis, except that the NYLL "does not require a plaintiff to show that the employer was involved in interstate commerce or had $500,000 in minimum annual sales," as required under 29 U.S.C. § 203(s)(1)(A). *Reyes v. Lincoln Deli Grocery Corp.*, 2018 WL 2722455, at *3 (S.D.N.Y. June 5, 2018) (citing *Santillan*, 822 F. Supp. 2d at 292). Finally, to state a claim for spread of hours pay under the Hospitality Industry Wage Order, 12 NYCRR § 146-1.6, a plaintiff need only "allege that he worked 'more than ten hours per day . . . and [was] not paid an additional hour at the minimum wage rate for days in which [he] worked [ten] or more hours.'" *Perez Garcia v. Hirakegoma Inc.*, 2020 WL 1130765, at *4 (S.D.N.Y. Mar. 9, 2020) (alternations in original) (quoting *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123 (E.D.N.Y. 2011)).

### 1.    Employee-Employer Relationship

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d), (g); *Zhong*, 498 F. Supp. 2d at 628. The Supreme Court has emphasized that the FLSA defines "employer" with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). An individual may have multiple "employers," and "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA]." *Castillo v. Albert Einstein Coll. of Med. Inc.*, 2025 WL 692124, at *3 (S.D.N.Y. Mar. 4, 2025). An individual defendant may be held liable as an employer where he "possess[es] control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013).

"[C]ourts have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 n.21 (S.D.N.Y. 2011) (alteration in original) (quoting *Jiao v. Shi Ya Chen*, 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007)); *see also Wang v. Leo Chuliya, Ltd,* 2024 WL 324789, at *4 (S.D.N.Y. Jan. 29, 2024) ("Because the two statutory definitions are nearly identical, courts in this Circuit have interpreted 'employer' under the NYLL in the same way they interpret 'employer' in the FLSA.") (quoting *Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 372 (S.D.N.Y. 2022)).

Here, plaintiffs have adequately alleged that the Defaulted Defendant was their "employer" within the meaning of the FLSA and the NYLL. SAC ¶¶ 25-31. Specifically, plaintiffs allege that Kamolov was "an owner and operator of the Corporate Defendants who set[] the Corporate Defendants' payroll policies, including the unlawful practices complained of herein." *Id*. ¶ 25; *see also id*. ¶ 30 (both Individual Defendants "participated in the day-to-day operations of the

12

Corporate Defendants and acted intentionally in their direction and control of Plaintiffs"). Further, plaintiffs allege that Kamolov was "a frequent presence at Defendants' restaurants and kitchens and [took] an active role in ensuring that Defendants' restaurants and kitchens are run in accordance with Defendants' procedures and policies." *Id*. ¶ 50. These allegations, taken as true after default, sufficiently demonstrate that the Defaulted Defendant was plaintiffs' "employer" within the meaning of the FLSA and NYLL. *See Zhong*, 498 F. Supp. 2d at 628 (plaintiff's allegation that he "was employed by" defendant was sufficient to establish an employer-employee relationship under FLSA); *Irizarry*, 722 F.3d at 104-111 (an "employer" may include an individual owner who exercises sufficient operational control over employees).

### 2.    Unpaid Minimum Wages

In Counts I and III of their operative complaint, plaintiffs assert claims for unpaid minimum wages under the FLSA and the NYLL. *See* SAC ¶¶ 82-86, 90-92. The federal minimum wage was $7.25 per hour throughout plaintiffs' employment at Farida. 29 U.S.C. § 206(a)(1). Under state law, however, the minimum wage in New York City was $15.00 at all relevant times. NYLL § 652(1)(a)(i)-(ii). Moreover, "regulations promulgated under federal and state law set forth different rules governing the methods to be used to compute an employee's regular rate of pay." *Bemejo v. Shaker Contractors, Corp.*, 2022 WL 17251667, at *2 (S.D.N.Y. Nov. 28, 2022).

Under federal law, if an employee is paid a flat daily rate or weekly salary, his "regular hourly rate" is generally determined by dividing the total dollars he earns for the week by the number of hours he worked that week. *See* 29 C.F.R. §§ 778.112 (day rate), 778.113(a) (weekly salary); *Bemejo*, 2022 WL 17251667, at *2 ("[U]nder the FLSA, Plaintiffs' regular rate must be determined . . . by dividing the total compensation they received each week by the total hours they worked in that week."). But under New York's Hospitality Industry Wage Order (which governs restaurant workers such as plaintiffs), "[i]f an employer fails to pay an employee an hourly rate of

13

pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." 12 NYCRR § 146-3.5; *see also*, *e.g.*, *Hernandez v. Jrpac Inc.*, 2016 WL 3248493, at \*32 (S.D.N.Y. June 9, 2016) ("Under the NYLL, the Court divides the pay the plaintiff in question actually received by the lesser of 40 hours or the actual number of hours he worked during the work week.")

Here, plaintiffs allege that throughout their employment, they received a flat rate (for Kargar and Foster, a daily rate; for Diaz, a weekly salary), as a result of which defendants "fail[ed] to pay minimum wage for all hours worked." SAC ¶¶ 84, 91. In order to determine whether plaintiffs have stated a minimum wage claim under either federal or state law, however, the Court must look to each plaintiff's specific allegations as to the hours that he or she worked and the payment that he or she received.

Plaintiff Kargar alleges that, from July 2020 to April 2021, she typically worked six days per week, SAC ¶ 53, for a total of 78 hours per week, *id.*, but was paid "a flat [] rate of one hundred and twenty dollars ($120.00) per day worked, with zero tips," *id.* ¶ 54, that is, $720 for the week. She does not allege that there were any weeks in which she worked more than 78 hours, or earned less than $720. Assuming the truth of her allegations, Kargar's regular hourly rate under federal law was $9.23 per hour ($720 ÷ 78 hours), which was above the federal minimum wage. Her regularly hourly rate under state law was $18 ($720 ÷ 40), which was above the then-applicable New York minimum wage. I therefore conclude that Kargar has not stated any minimum wage claim.

Plaintiff Foster alleges that from July 1, 2021 to July 19, 2022, she typically worked five days per week, for approximately 12.5 hours per shift, which aggregates to 62.5 hours per week.

SAC ¶¶ 62, 64. During some weeks, however, Foster worked as many as six shifts (which would mean a total of 75 hours for the week), or as few as four (which would mean a total of 50 hours for the week). *Id*. ¶ 64. For her labor, Foster received a daily rate of $120 per day, which (at some unspecified point) increased to $200 per day. *Id*. ¶ 67. Assuming the truth of these allegations, Foster's regular hourly rate under federal law was always at least $9.60 per hour, which was above the federal minimum.[2] Under New York law, however, her regular hourly rate ranged from $12 per hour (for a four-shift week when she was paid $120 per shift), which was below the applicable New York minimum wage, to $30 per hour (for a six-shift week in which she was paid $200 per shift), which was well above the New York minimum.[3] I therefore conclude that Foster has stated a minimum wage claim under New York law for a portion of her employment at Farida.

Plaintiff Diaz alleges that, from October 2020 to April 2021, he typically worked six days per week, for a total of 78 hours per week, SAC ¶ 58, for which he was paid "an initial flat weekly rate of four hundred dollars ($400.00) in cash, with zero tips," followed by a "weekly rate of five hundred dollars ($500.00), with zero tips, followed by an eventual raise to a weekly rate of six hundred dollars ($600.00), with zero tips." *Id*. ¶ 59. Diaz does not allege that there were any weeks in which he worked more than 78 hours per week or was paid less than $400. Assuming the truth of his allegations, Diaz's regular hourly rate under federal law was $5.13 (below the federal minimum) throughout the period when his weekly salary was $400 ($400 ÷ 78 hours); $6.41 (still below the federal minimum) throughout the period when his weekly salary was $500 ($500 ÷ 78 hours); and $7.69 (above the federal minimum) once his weekly salary rose to $600 ($600 ÷ 78

---

[2] For a 4-shift week, the calculation is: $480 ÷ 50 hours. For a 5-shift week, the calculation is: $600 ÷ 62.5 hours. For a 6-shift week, the calculation is: $720 ÷ 75 hours.

[3] For a 4-shift week at $120 per shift, the calculation is: $480 ÷ 40 hours. For a 6-shift week at $200 per shift, the calculation is: $1,200 ÷ 40 hours.

hours). Plaintiff Diaz has therefore stated a minimum wage claim under the FLSA for a portion of his employment at Farida. Under New York law, Diaz's regular hourly rate was $10 per hour (below the New York minimum) throughout the period when his weekly salary was $400 ($400 ÷ 40 hours); $12.50 per hour (still below the New York minimum) throughout the period when his weekly salary was $500 ($500 ÷ 40 hours); and $15 per hour (meeting the New York minimum) once his weekly salary rose to $600 ($600 ÷ 40 hours). I therefore conclude that plaintiff Diaz has stated a minimum wage claim under New York as well as federal law for a portion of his employment at Farida.

### 3. Unpaid Overtime Wages

In Counts II and IV, plaintiffs assert claims for unpaid overtime wages under the FLSA and the NYLL. *See* SAC ¶¶ 87-89, 93-99. Under both federal and state law, an employer is required to pay an overtime rate of one and one-half times the employee's "regular rate" for hours worked in excess of 40 per week. 29 U.S.C. § 207(a)(1); 12 NYCRR § 146-1.4. If the employee's regular rate is less than the applicable minimum wage, the required overtime rate is one and one-half times the minimum wage. *Martinez v. Dannys Athens Diner Inc.*, 2017 WL 6335908, at \*4 (S.D.N.Y. Dec. 5, 2017); *Baltierra v. Advantage Pest Control Co.*, 2015 WL 5474093, at \*5 (S.D.N.Y. Sept. 18, 2015). To state an unpaid overtime claim, "a plaintiff must allege only that she worked compensable overtime in a workweek longer than forty hours, and that she was not properly compensated for that overtime." *Tackie v. Keff Enters. LLC*, 2014 WL 4626229, at \*3 (S.D.N.Y. Sept. 16, 2014) (citing *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 199-201 (2d Cir. 2013)).

Here, each plaintiff alleges that he or she typically worked in excess of 40 hours per week but did not receive any overtime premiums. SAC ¶¶ 53-54, 58, 69-70. Moreover, each plaintiff

describes his or her typical weekly schedule, amounting to 78 hours (for Kargar and Diaz) or 62.5 hours (for Foster), and each alleges that he or she was paid a flat daily or weekly rate for all hours worked. *Id*. ¶¶ 53, 58, 64. These allegations are sufficient to plead a plausible claim for unpaid overtime wages under both federal and state law. *See Cazarez v. T&T 130 Pizza Corp*., 2025 WL 964551, at *7 (S.D.N.Y. Feb. 26, 2025) (plaintiff adequately stated claim for unpaid overtime wages under FLSA and NYLL by alleging that he "typically worked at least 71 hours per week over six days . . . but did not receive any premium for his overtime hours"), *adopted*, 2025 WL 964450 (S.D.N.Y. Mar. 31, 2025); *Carrasquillo v. Westech Sec. & Investigation Inc.*, 2024 WL 4227795, at *5 (S.D.N.Y. Sept. 17, 2024) (plaintiff adequately stated a claim for unpaid overtime where she "[did] not merely allege that she worked over forty hours per week, each week, but additionally provide[d] a particularized estimate of her overtime hours").

### 4. Spread of Hours Pay

In Count V of their operative complaint, plaintiffs assert claims for unpaid spread of hours pay. SAC ¶¶ 96-98. Under 12 NYCRR § 146-1.6, hospitality industry employees are entitled to an extra hour of pay, at the applicable minimum wage rate, for each day in which the "spread of hours," or the "length of the interval between the beginning and end of [plaintiff's] workday," is greater than ten. "This section shall apply to all employees in restaurants and all-year hotels, regardless of a given employee's regular rate of pay." *Id*. § 146-1(d); *see also Benitez v. Bolla Operating LI Corp.*, 189 A.D.3d 970, 972, 137 N.Y.S.3d 371, 373 (2d Dep't 2020) (in the hospitality industry, unlike other industries, "all employees" are entitled to spread of hours pay, "regardless of their regular pay rate"). Thus, plaintiffs were entitled to one extra hour's pay, at the then-prevailing minimum wage rate, on each day that they worked more than ten hours.

17

Here, plaintiffs allege that all of their shifts were longer than 10 hours, but that they were paid a flat daily rate (or weekly salary) regardless of the number of hours they worked. SAC ¶¶ 54, 59, 67. In addition, Foster specifically alleges that "[f]or her days spanning more than 10 hours, Defendants did not pay [her] anything extra such [as] 'spread of hours' pay." *Id*. ¶ 70. These allegations are sufficient to plead a spread of hours claim.

### 5. Wage Statements and Wage Notices

In Counts VI and VII, plaintiffs assert claims under the Wage Theft Prevention Act (WTPA), codified at NYLL § 195, for failure to provide wage notices or wage statements. SAC ¶¶ 99-104. Under the WTPA, employers must provide each employee, at the time of hiring, with a notice disclosing her rate of pay and other required information. NYLL § 195(1). Here, plaintiffs allege that defendants did not provide them "proper wage notices at the time of hire or by February 1 of each year." SAC ¶¶ 71, 76. The WTPA also requires employers to furnish each employee with a written statement, every pay period, that includes, *inter alia*, the employee's regular and overtime hourly rate, the number of regular hours worked, and the number of overtime hours worked. NYLL § 195(3). Here, plaintiffs allege that they never received any "paystubs or breakdown of the hours that [they] worked or [their] regular or overtime rates." SAC ¶¶ 54, 59, 71, 77, 103.

The WTPA provides for statutory damages of $50.00 per work day (up to a maximum of $5,000) for a violation of § 195(1), and $250.00 per work day (up to a maximum of $5,000) for a violation of § 195(3). NYLL §§ 198(1-b), 198(1-d). In federal court, however, a plaintiff may not collect a statutory penalty merely upon proof of the corresponding statutory violation. In order to establish standing under the "Cases and Controversies" clause, *see* U.S. Const. art. III § 2, a plaintiff must show that she suffered a "concrete and particularized injury" as a result of the statutory violation. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In other words, "a

18

plaintiff cannot rely on technical violations of the Labor Law but must allege actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024) (internal quotations and citation omitted).

Here, plaintiffs fail to allege any facts showing a "causal connection" between the lack of wage notices or wage statements, and some concrete "downstream harm." *Guthrie*, 113 F.4th at 308 ("[U]nless the plaintiff-employee can show that he or she . . . would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided, the plaintiff-employee has not established a concrete injury-in-fact sufficient to confer standing to seek statutory damages[.]"). Instead, plaintiffs allege, in wholly conclusory terms, that defendants' WTPA violations, in and of themselves, entitle them to statutory damages. *See* SAC ¶¶ 101, 104. Plaintiffs have therefore failed to establish Article III standing for their WTPA claims and should not be awarded any statutory damages for the Defaulted Defendant's violations of NYLL §§ 195(1) and 195(3).

### 6.    Unlawful Tip Retention Under the NYLL

In Count VIII, plaintiffs assert that defendants unlawfully withheld their tips in violation of state law. *See* SAC ¶¶ 105-07. Under the NYLL, "[n]o employer or his agent . . . shall retain any part of a gratuity or of any charge purported to be a gratuity for an employee." NYLL § 196-d. Here, plaintiffs allege that they were "never paid any tips," SAC ¶ 3, because the "owners pocketed all of the tips." *Id*. ¶ 75; *see also id*. ¶ 106 (defendants withheld "all of the tips left by customers"). Plaintiffs Kargar and Diaz further allege that they "observed Kamolov and Gabbassova take and keep all cash left by customers as tips," and that "no credit card tips were ever dispersed to [them]." *Id*. ¶¶ 55, 60.

These allegations are sufficient to plead an unlawful tip retention claim under the NYLL. *See*, *e.g.*, *Lunnon v. Rigolo Prods. LLC*, 2025 WL 1309488, at *4 (E.D.N.Y. Jan. 27, 2025) (plaintiff adequately stated an unlawful tip retention claim by alleging that defendants required him "and the other employees 'to pool their tips pursuant to a mandated tip sharing scheme' and then 'unlawfully withheld all, or nearly all,' of those tips"); *Chen v. Shanghai Cafe Deluxe, Inc.*, 2023 WL 2401376, at *9 (S.D.N.Y. Mar. 8, 2023) (plaintiff stated an unlawful tip retention claim where tips were shared with owner of restaurant); *Mahoney v. Amekk Corp.*, 2016 WL 6585810, at *13 (E.D.N.Y. Sept. 30, 2016) (bartender stated an unlawful tip retention claim by alleging that defendants "retained all tips she received from customers during the course of her employment"), *adopted*, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016).

### C.    NYCHRL Sex-Based Discrimination

In Counts IX and X of the SAC, respectively, plaintiff Kargar alleges that the Defaulted Defendant violated the NYCHRL by creating a hostile work environment and by sexually harassing her. SAC ¶¶ 110-123. Under the NYCHRL, "it is unlawful for an employer to discriminate against an individual 'in compensation or in terms, conditions, or privileges of employment' because of the individual's gender." *Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 295 (S.D.N.Y. 2016) (quoting N.Y.C. Admin. Code § 8-107(1)). Sexual harassment is "one species of sex- or gender-based discrimination," *Owens v. PriceWaterHouseCoopers LLC*, 786 F. Supp. 3d 831, 843 (S.D.N.Y. 2025) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 75, 872 N.Y.S.2d 27, 37 (1st Dep't 2009)), and "can be pleaded as either quid pro quo harassment or the creation of a 'hostile work environment.'" *Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 255 (S.D.N.Y. 2024) (citation omitted), *reconsideration denied,* 2024 WL 4635482 (S.D.N.Y. Oct. 31, 2024); *accord Fattoruso v. Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 578 (S.D.N.Y.

2012), *aff'd,* 525 F. App'x 26 (2d Cir. 2013). Here, although plaintiff Kargar has divided her NYCHRL claim into two counts, both of them recognizably allege that the Defaulted Defendant sexually harassed her by creating a "hostile work environment," SAC ¶¶ 114, 119, rather than by conditioning "benefits or advantages based upon the acceptance or denial of sexual advances," which is the hallmark of a quid pro quo claim. *Fattoruso*, 873 F. Supp. 2d at 578. I therefore treat Counts IX and X as coextensive for liability purposes.

"For an employer's conduct to be actionable as hostile work environment sexual harassment, it 'must be both objectively and subjectively offensive, such that a reasonable person would find the behavior hostile and abusive, and such that the plaintiff herself did, in fact, perceive it to be so.'" *Alexander v. Possible Prods., Inc.*, 336 F. Supp. 3d 187, 194 (S.D.N.Y. 2018) (quoting *San Juan v. Leach*, 278 A.D.2d 299, 299, 717 N.Y.S.2d 334, 336 (2nd Dep't 2000); *accord Santana*, 198 F. Supp. 3d at 295. The conduct must rise beyond "petty slights and trivial inconveniences." *Alexander*, 336 F. Supp. 3d at 194; *Santana*, 198 F. Supp. 3d at 295-96. However, under the NYCHRL (unlike federal or state law), "the offensive conduct need not be 'severe or pervasive,' but need only amount to 'unwanted gender-based conduct.'" *Erasmus v. Deutsche Bank Americas Holding Corp.*, 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015) (quoting *Anderson v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009)); *see also Santana*, 198 F. Supp. 3d at 295 ("Because the NYCHRL is designed to be broadly remedial, liability for sexual harassment under the NYCHRL is determined by the existence of any unequal treatment, and questions of severity and frequency are reserved for the consideration of damages."). Moreover, liability under § 8-107(1)(a) is not limited to "employers," but extends to individual supervisory employees who "have a role in administering plaintiff's compensation, terms, conditions, or privileges of employment." *Russell v. New York Univ.*, 42 N.Y.3d 377, 391, 221 N.Y.S.3d 425, 435 (2024).

Here, plaintiff Kargar alleges that, from the beginning of her employment at Farida, she "was subjected to hostility and discrimination by defendant Kamolov based on her sex." SAC ¶ 111. On numerous occasions, "Kamolov made sexist comments about women in general and about plaintiff Kargar personally," including derogatory comments about her "physique, loudly stating in front of customers and staff that she is a 'hot bitch' and has a 'tight body.'" *Id*. ¶ 112. In addition, on "more than one occasion," Kamolov came up behind her, placed his arms under hers, and grabbed her breasts, *id*. ¶ 113, causing her "mental and emotional pain and suffering." *Id*. ¶ 117. These allegations, taken as true, describe conduct amounting to more than petty slights and trivial inconveniences. Kamolov's actions were "objectively and subjectively offensive." *Alexander*, 336 F. Supp. 3d at 194. Moreover, Kamolov was not merely a fellow worker, he was an "owner and operator" of the Corporate Defendants. *Id.* ¶ 26. Consequently, I conclude that Kargar has adequately pleaded that Kamolov sexually harassed her, in violation of the NYCHRL, by creating a hostile work environment.

### D.    Negligent Infliction of Emotional Distress

Lastly, in Count XI, plaintiff Kargar asserts a claim for negligent inflection of emotional distress (NIED) arising out of "Kamolov's harassment of the Plaintiff," which caused her to suffer "severe mental and emotional distress." SAC ¶ 126.

To plead an NIED claim under New York law, a plaintiff must allege "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc*., 992 F.3d 67, 81 (2d Cir. 2021). However, an NIED claim cannot survive if it is duplicative of another cause of action. *See Doe v. Uber Techs., Inc*., 551 F. Supp. 3d 341, 363-65 (S.D.N.Y. 2021) (dismissing plaintiff's NEID claim against Uber as

duplicative of her claim for negligent hiring and supervision of the Uber driver who allegedly assaulted her); *Watkins v. Harlem Ctr. for Nursing & Rehab., LLC*, 2021 WL 4443968, at \*14 (S.D.N.Y. Sept. 28, 2021) (dismissing plaintiffs' NIED claim as "duplicative of their claim for negligence"); *Richardson v. City of New York*, 2015 WL 7752143, at \*19 (S.D.N.Y. Nov. 18, 2015) (recommending dismissal of NIED claim based "on the same conduct giving rise to his state law claims for negligence and medical malpractice"), *adopted*, 2016 WL 1637997 (S.D.N.Y. Apr. 22, 2016).

Here, plaintiff Kargar's claim for negligent infliction of emotional distress against Kamolov fails because it is duplicative of her claims against him for sexual harassment, which "rest on the same facts and seek the same damages." *Watkins*, 2021 WL 4443968 at \*14; *see also Caravalho v. City of New York*, 2016 WL 1274575, at \*23 (S.D.N.Y. Mar. 31, 2016) (dismissing NIED claim because "the conduct at issue – [defendant's] allegedly unreasonable use of force – and any resulting emotional damage is entirely subsumed by" plaintiff's other claims). I have therefore assessed plaintiff Kargar's request for emotional distress damages solely under the NYCHRL.

## V.    DAMAGES

### A.    Legal Standards

Although the Court must accept all well-pleaded facts as true when determining liability, it need not – and indeed cannot – rely on the pleadings to establish plaintiffs' damages. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Rather, plaintiffs must substantiate their claimed damages with "admissible, authenticated evidence," *McLaughlin v. Barron*, 2018 WL 1872535, at \*2 (S.D.N.Y. Jan. 24, 2018), *adopted*, 2018 WL 993627 (S.D.N.Y. Feb. 20, 2018), which must be sufficient to "ascertain the amount of damages with reasonable certainty." *Credit Lyonnais*, 183 F.3d at 155; *see also House v. Kent Worldwide Mach.*

23

*Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010) (summary order) ("[T]here must be a basis upon which the court may establish damages with reasonable certainty.").

The "reasonable certainty" standard does not require a wage and hour plaintiff to submit a complete set of employment records. Where, as here, such records are non-existent or incomplete, the Court may credit the plaintiffs' "recollection and estimates of hours worked," which are "presumed to be correct." *Santana*, 198 F. Supp. 3d at 292 (*quoting Liu v. Jen Chu Fashion Corp.*, 2004 WL 33412, at *3 (S.D.N.Y. Jan. 7, 2004)); *accord Lemus v. Pezzementi*, 2023 WL 6519723, at *5 (S.D.N.Y. June 16, 2023), *adopted*, 2023 WL 6390170 (S.D.N.Y. Sept. 29, 2023). However, each plaintiff must present his recollection or estimate in admissible form – typically, after default, in the form of a declaration or affidavit – as the court cannot rely on the pleadings for this purpose. *See Hernandez Gomez v. 4 Runners, Inc.*, 769 F. App'x 1, 3 (2d Cir. 2019) (summary order) (affirming district court's denial of any post-default damages under the FLSA or the NYLL to plaintiff who failed to submit any declaration and instead cited "only to the allegations in the complaint, which are not evidence and are not accepted as true as they relate to damages.").

The court must also "ensure that [plaintiffs'] approximations and estimates are reasonable and appropriate," *Perez Garcia*, 2020 WL 1130765, at *4 (quoting *Coley v. Vannguard Urban Improvement Ass'n, Inc.*, 2018 WL 1513628, at *7 (E.D.N.Y. Mar. 27, 2018) (as amended Mar. 29, 2018)), and take care not to issue a default judgment that differs in kind from, or exceeds in amount, "what is demanded in the pleadings.'" *Id.* (quoting Fed. R. Civ. P. 54(c)). Consequently, if the factual assertions in a plaintiff's post-default declarations would produce a higher damages award than the factual allegations in his complaint, the Court may "decline to credit his declaration to the extent it is more favorable to him than his pleading." *Cazarez*, 2025 WL 964551, at *8; *see also*, *e.g.*, *Hernandez v. BMNY Contracting Corp.*, 2025 U.S. Dist. LEXIS 82479, at *39 (S.D.N.Y.

24

Apr. 29, 2025) (declining to "credit [plaintiff's] inquest materials to the extent they seek damages for periods of employment excluded by the corresponding allegations in his pleading"); *Avedana v. Casa Ofelia's Bakery LLC*, 2021 WL 4255361, at *11 (E.D.N.Y. Aug. 19, 2021) (relying on "sample time cards" to establish how many hours plaintiff worked, because her post-default testimony was "significantly different from the allegations in the Complaint" and "appears to be inflated"), *adopted*, 2021 WL 4248857 (E.D.N.Y. Sept. 17, 2021); *Vilchis v. Seoul Sisters, Inc.*, 2016 WL 6106478, at *5 (E.D.N.Y. Sept. 15, 2016) (relying on plaintiffs' post-default declarations only "to the extent they do not conflict with the allegations in the complaint"), *adopted*, 2016 WL 6102342 (E.D.N.Y. Oct. 18, 2016).

Similarly, other discrepancies and inconsistencies in plaintiffs' inquest materials are properly resolved against them. For example, in *Hernandez v. BMNY Contracting*, this Court disregarded plaintiffs' testimony as to the number of hours they "regularly" worked where that testimony was inconsistent with other evidence, including available paystubs. 2025 U.S. Dist. LEXIS 82479, at *35; *see also Koutlakis v. C P Grill Corp.*, 2024 WL 4250250, at *13 (E.D.N.Y. Aug. 20, 2024) (limiting damages to "the first three weeks" where plaintiff's damages chart for later periods was inconsistent with her other inquest submissions and she failed to "explain this discrepancy"); *Llolla v. Karen Gardens Apartment Corp.*, 2014 WL 1310311, at *7 (E.D.N.Y. Mar. 10, 2014) ("[T]o the extent Llolla's claims are internally inconsistent or belie common sense, I conclude that Llolla has failed to prove such damages to a reasonable certainty and therefore resolve such discrepancies in the defendants' favor."), *adopted as modified on other grounds*, 2014 WL 1311773 (E.D.N.Y. Mar. 28, 2014).

In wage and hour cases such as this one, a plaintiff may be entitled to damages under both the FLSA and NYLL, but may "not recover twice" for the same injury. *Gonzalez Mercedes.*, 2018

WL 7291452, at *5 (quoting *Cao v. Wu Liang Ye Lexington Rest., Inc.*, 2010 WL 4159391, at *3 (S.D.N.Y. Sept. 30, 2010)). Rather, she "may recover under the statute which provides the greatest amount of damages." *Id.* (quoting *Wicaksono v. XYZ 48 Corp.*, 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), *adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011)). Here, the statute that provides the greatest amount of damages is the NYLL.[4] Consequently, I have analyzed plaintiffs' entitlement to wage and hour damages solely under state law.

### B.        Record Evidence Regarding Damages

Plaintiffs provided the Court with a mix of evidentiary material in support of their request for damages against Kamolov. Plaintiff Foster submitted two declarations, both of them generally consistent with her allegations in the SAC. Her most detailed declaration is dated April 6, 2023, and was filed in connection with plaintiffs' default motion. In that document Foster attests to the dates of her employment, the days and hours she typically worked, and the way in which defendants systematically withheld most of her tips. Foster Default Decl. ¶¶ 4, 8-9, 12-14. Foster also attests that her day rate was $120 until the week of January 14, 2022, when it was raised to $200. *Id*. ¶ 11.

Plaintiff Kargar also submitted two declarations. Her most detailed declaration is dated November 17, 2022, and was submitted in connection with plaintiffs' collective certification motion. In that document she attests to the dates of her employment, the days and hours she typically worked, and her day rate, which was $120 throughout her employment. Kargar Coll. Cert. Decl. ¶¶ 2, 5-6. As to her withheld-gratuity claim, however, Kargar states only that she "often" saw the Individual Defendants "take and keep" her cash tips, and that she "did not receive"

---

[4] Not only is the New York minimum wage significantly higher than the federal minimum; New York requires an employer to provide spread of hours pay, but federal law does not. I note as well that plaintiffs' claim for withheld gratuities is pleaded only under state law. *See* SAC ¶¶ 105-07.

credit card tips. *Id*. ¶¶ 11-12. In her second declaration, dated April 6, 2023, Kargar again attests to the dates of her employment, *see* Kargar Default Decl. ¶ 4, but does not discuss her hours, her wages, or her tips. Instead, she describes the facts underlying her sexual harassment claim and the emotional distress she experienced as a result. *Id*. ¶¶ 7-10. Although her description is generally consistent with her allegations in the SAC, she clarifies, in her declaration, that Kamolov approached her from behind and grabbed her breasts "on one occasion" only. *Compare id*. ¶ 8 ("one occasion"), *with* SAC ¶ 113 ("more than one occasion").

Despite the clear guidance provided by the Court,[5] plaintiff Diaz did not submit any declaration – or any other admissible evidence – in support of his request for damages. Nor did he submit evidence at the collective certification stage. Moreover, neither Foster nor Kargar provides any evidence that would substantiate Diaz's allegations as to any aspect of his alleged employment at Farida. Accordingly, I cannot recommend that Diaz be awarded any damages. *See Hernandez Gomez,* 769 F. App'x at 3 (affirming denial of damages to plaintiff who failed to submit post-default affidavit or declaration); *Cazares v. 2898 Bagel & Bakery Corp.*, 2022 WL 1410677, at *6 (S.D.N.Y. Apr. 7, 2022) (recommending denial of damages to six plaintiffs who failed to submit affidavits or declarations), *adopted*, 2022 WL 1406203 (S.D.N.Y. May 4, 2022).

In addition to the Foster and Kargar declarations, plaintiffs have submitted detailed damages tables prepared by attorney Dodson. *See* Foster Damages Table (Dkt. 183-1); Kargar Damages Table (Dkt. 183-2); Diaz Damages Table (Dkt. 183-3). In their Proposed Findings, plaintiffs explain that counsel attempted to reconstruct each plaintiff's work schedule based in part

---

[5] *See* Sched. Order ¶ 2 (directing plaintiffs to support their proposed findings of fact with "one or more declarations or affidavits, which may attach and authenticate any documentary evidence needed to establish the proposed damages," and cautioning that "[a]ll evidence submitted in support of plaintiffs' request for damages or other relief must be in admissible form.").

on their attestations as to their usual or typical schedules and in part on documents produced in discovery, including records of electronic payments made via Zelle and WhatsApp text messages concerning the servers' work schedules. Prop. Findings at 9; *see also* Foster Default Decl. ¶ 15 ("To communicate about scheduling, requests for days off, and other similar matters, Farida texted with us workers using WhatsApp, both individually and as a group chat.").

Where there are discrepancies between plaintiffs' declarations and their respective damages tables as to the days on which they worked and the rates they were paid, I credit the tables, because they take into account what documentary evidence exists and are in most (but not all instances) more conservative than plaintiffs' estimates. For example, while Foster and Kargar each recollected working shifts of approximately 12.5 hours or more, *see* Foster Default Decl. ¶ 5; Kargar Coll. Cert. Decl. ¶ 6, their damages tables reflect that each shift was 12 hours long – based in part on contemporaneous WhatsApp messages providing start and stop times.[6] Similarly, the damages tables generally show that plaintiffs worked fewer shifts per week than alleged in their pleadings and declarations.[7] Again, I credit this data since it is at least partially based on contemporaneous text messages discussing plaintiffs' schedules and thus is likely to be more accurate than plaintiffs' unaided recollection. *See Avedana*, 2021 WL 4255361, at *11 (crediting "sample time cards" to establish how many hours plaintiff worked).

---

[6] Additionally, as counsel notes, "there are some indications in the WhatsApp messages that [Foster] ran late some of the time[.]" Dodson Decl. ¶ 42.

[7] However, Kargar's damages table shows that she worked *more* days per week in February and March 2021 than she recollects in her declaration. *Compare* Kargar Default Decl. ¶ 9 (attesting that she could "only work 3 days per week" in those months because Kamolov "was screaming at [her] in front of customers and could not control his behavior"), *with* Kargar Damages Chart at ECF pp. 2-3 (reflecting 20 days of work in February and another 20 days in March). For damages purposes, I have credited Kargar with working all 40 of these days, which increases her damages for unpaid overtime wages, unpaid spread of hours pay, and withheld tips.

Kargar's day rate, as set forth in her damages tables, is also consistent with her declaration: $120 per day, throughout her employment at Farida. *See* Kargar Coll. Cert. Decl. ¶ 5; Kargar Damages Table. However, although Foster attested that her day rate increased from $120 to $200 during the week of January 14, 2022, *see* Foster Default Decl. ¶ 11, her damages table – based in part on Zelle records – shows that her day rate increased from $120 to $150 during the week of July 26, 2021, and then increased again, to $200, during the week of August 9, 2021, where it remained throughout the rest of her employment. *See* Foster Damages Table at ECF p. 1. Again, I credit the more detailed damages chart (which produces a more modest award for unpaid minimum wages but a larger award for unpaid overtime) over Foster's declaration on this point.

### C.      Plaintiffs' NYLL Damages

Plaintiffs Foster and Kargar seek $38,618.53 and $26,575.65, respectively, in what they characterize as "back pay," including unpaid minimum wages, unpaid overtime wages, unpaid spread of hours pay, and withheld tips, plus the same amount in liquidated damages. Prop. Findings at 22.[8] They do not request pre-judgment interest. *See id*. at 21-22 (seeking post-judgment interest only).

After careful review of the record, I calculate that plaintiff Foster is owed $360 in unpaid minimum wages, $10,072.50 in unpaid overtime wages, $2,370 in unpaid spread of hours pay, and $18,960 in unlawfully withheld tips, for a total of $31,762.50. Under NYLL § 198(1-a), plaintiff Foster is also entitled to liquidated damages in the same amount, bringing her NYLL damages to $63,525. After subtracting the $14,000 that the Settled Defendants paid her with respect to the

---

[8] Plaintiffs Foster and Kargar also request $10,000 in statutory damages under the WTPA for the Defaulted Defendant's failure to provide wage statements and wage notices. For the reasons set forth in Part IV(B)(5), *supra*, however, they are not entitled to WTPA damages.

same claims, I conclude that plaintiff Foster should be awarded damages of $49,525.00 under the NYLL.

I further calculate that plaintiff Kargar is owed $6,840 in unpaid overtime wages, $1,590 in unpaid spread of hours pay, and $12,720 in unlawfully withheld tips, for a total of $21,150.[9] She is also entitled to liquidated damages in the same amount, bringing her NYLL damages to $42,300. After subtracting the $14,000 that the Settled Defendants paid her with respect to the same claims, I conclude that plaintiff Kargar should be awarded a total of $28,300 in NYLL damages.

### 1.    Unpaid Minimum Wages

As noted above, the "regular hourly rate" of a hospitality industry employee who is paid by the day is calculated by "dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." 12 NYCRR § 146-3.5. According to plaintiff Foster's damages table, she worked at Farida for a total of 45 weeks, working between one and five shifts per week. *See* Appendix 1. During her first week of employment (the week of June 28, 2021), she worked one shift of 12 hours, for which she was paid a day rate of $120, producing a regular hourly rate of $10 ($120 ÷ 12 hours). This was $5 below New York's $15 minimum wage at the time. Thus, for week 1, Foster was underpaid by $60 ($5 × 12 hours). The same is true for weeks 3 and 4, during each of which she also worked one shift of 12 hours, at a day rate of $120. *See id.*

In week 2 (the week of July 5, 2021), Foster worked four shifts of 12 hours each, for which she was paid a total of $480, resulting in a regular hourly rate of $12 ($480 ÷ 40 hours). For week

---

[9] As noted in Part IV(B)(2), *supra*, plaintiff Kargar did not plead facts sufficient to state a claim for unpaid minimum wages.

2, therefore, Foster was underpaid by $120 ($3 × 40 hours) for her first 40 hours of work. Finally, in week 5, Foster worked two shifts of 12 hours each, for which she was paid $150 per day. This produces a regular hourly rate of $12.50 ($300 ÷ 24 hours), which was $2.50 below New York's minimum wage. Consequently, for week 5, Foster is owed $60 ($2.50 × 24 hours), and for the first five weeks together, she is owed $360 in unpaid minimum wages.[10]

### 2.    Unpaid Overtime Wages

Under New York law, plaintiffs Kargar and Foster were entitled to an overtime rate of one and one-half times their "regular rate" for hours worked in excess of 40 per week. 12 NYCRR § 146-1.4. Where the employee was paid at or below the minimum wage, "the appropriate overtime rate [is] one-and-a-half times the minimum wage rate." *Nana v. Le Viking LLC*, 2019 WL 3244181, at *3 (S.D.N.Y. July 19, 2019); *see also Martinez*, 2017 WL 6335908, at *4. However, where the employee is paid above the applicable minimum wage, the overtime rate is one and one-half times the employee's regular rate – as calculated under New York law – which can be significantly higher than one and one-half times the minimum wage. *Martinez*, 2017 WL 6335908, at *4; *Baltierra*, 2015 WL 5474093, at *5. Thus, to calculate the overtime wages that plaintiffs Foster and Kargar are owed under New York law, the Court must first determine their regular rate of pay for each week they worked. *See Amaya v. Superior Tile & Granite Corp.*, 2012 WL 130425, at *7 (S.D.N.Y. Jan. 17, 2012) ("The employee's 'regular rate' during a particular week is the basis for calculating overtime pay due to the employee for that week.")

As noted above, Foster was paid less than the New York minimum wage during her first five weeks of employment at Farida. For those weeks, therefore, her overtime rate was $22.50

---

[10] Beginning in week 6 of Foster's employment, she was paid at or above the New York minimum wage for her first 40 hours of work, and consequently does not have a claim for unpaid minimum wages. *See* Appendix 1.

($15 × 1.5), and she is owed a total of $180 for the eight hours of overtime work she performed in week 2. *See* Appendix 1. In week 6, her regular hourly rate was $18.75 ($750 ÷ 40 hours), making her overtime rate $28.125 ($18.75 × 1.5) and entitling her to $562.50 for the 20 hours of overtime she worked that week. *Id*.

For the remaining 39 weeks of Foster's employment at Farida (the weeks beginning August 9, 2021 through September 26, 2021, and then the weeks beginning December 6, 2021 through July 17, 2022), she worked a total of 136 shifts, earning $200 for each day worked. *See* Appendix 1. Foster's regular hourly rate during this period was $16.67 for weeks in which she worked one, two, or three shifts ($200 ÷ 12 hours; $400 ÷ 24 hours; $600 ÷ 36 hours); $20 for weeks in which she worked four shifts ($800 ÷ 40 hours); and $25 for weeks in which she worked five shifts ($1,000 ÷ 40 hours). Accordingly, her overtime rate was $25, $30, and $37.50, respectively. Following this methodology, as shown in Appendix 1, plaintiff Foster is entitled to an aggregate unpaid overtime award of $9,525.50.

As to plaintiff Kargar, she was paid a uniform day rate of $120 throughout her employment. Thus, her regular hourly rate for the entirety of her employment was $10 for weeks in which she worked one, two, or three shifts ($120 ÷ 12 hours; $240 ÷ 24 hours; $360 ÷ 36 hours); $12 for weeks in which she worked four shifts ($480 ÷ 40 hours); $15 for weeks in which she worked five shifts ($600 ÷ 40 hours); and $18 for weeks in which she worked six shifts ($720 ÷ 40 hours). Her overtime rate – for all hours in excess of 40 – was $22.50 per hour, except for weeks during which she worked six shifts, when it was $27 ($18 × 1.5). Following this methodology, as shown in Appendix 2, plaintiff Foster is entitled to an aggregate unpaid overtime award of $6,840.

### 3.  Unpaid Spread of Hours

As discussed in Part IV(B)(4), *supra*, plaintiffs Foster and Kargar are also entitled to spread of hours pay, at the minimum wage rate, for each day in which they worked 10 hours or more. *See*

32

12 NYCRR § 146-1.6. Each of Foster's 158 shifts was longer than 10 hours. Therefore, she is owed $2,370 in spread of hours damages ($158 \times \$15$). Likewise, each of Kargar's 106 shifts was longer than 10 hours. Consequently, she is owed $1,590 in spread of hours damages ($106 \times \$15$).

### 4.    Withheld Tips

Next, plaintiffs Foster and Kargar request $35,090 and $16,840, respectively, in unlawfully withheld tips. Both plaintiffs attest that Farida's management collected all tips, retained 20% for themselves, and then divided the remainder among the servers to cover the servers' day rates. Kargar Coll. Cert. Decl. ¶¶ 9-10; Foster Default Decl. ¶¶ 13-14. If the total tips (less the 20% kept by management) were more than enough to cover the servers' day rates, the servers received the excess ("a little bit more") as a tip. Kargar Coll. Cert. Decl. ¶ 10; Foster Default Decl. ¶ 13. If the total tips (less the 20% kept by management) were not enough to cover the servers' day rates, they would be paid their full day rates but would not get anything extra in tips. Kargar Coll. Cert. Decl. ¶ 10; Foster Default Decl. ¶ 14 (noting that when gratuities were insufficient to cover the servers' day rates, "Farida would get some cash from the register" to cover the difference). Plaintiffs' declarations (which are corroborated in part by the WhatsApp messages submitted to the Court, *see* Dodson Decl. ¶ 31(3)), support the reasonable inference that management withheld most of the tips that they earned, either by taking the money for themselves or by using it to cover the servers' wages rather than distributing it in addition to their wages. *See Saavedra v. Dom Music Box Inc.*, 2024 WL 208303, at *10 (E.D.N.Y. Jan. 19, 2024) (employer who is not eligible for a "tip credit" may not use employee's tips to "offset" employee's wages).

Plaintiffs themselves do not present any estimate of the amount of tips unlawfully withheld from them. Instead, Attorney Dodson suggests that the Court take each server's day rate, add $40, and award that amount as unpaid tips. Dodson Decl. ¶¶ 31(1), 46(4)(g). That would be a sensible

result if the Court based its award on "Hypothetical Example 1," presented by counsel, in which tips for each shift totaled $1,200 and each of the 4 servers was paid at a day rate of $200:

> if on a given evening there were tips totaling $1,200 and 4 servers, it would be divided as follows: 20% ($240) retained, for a remainder of $960. Assuming each of the servers had a day rate of $200, that would leave $960 – (4 servers x $200) = $160. Dividing that by the 4 servers, each was supposed to get another $40 for that evening, on top of the $200 day rate, for a total of $240.

Dodson Decl. ¶ 31(1).

In reality, however, it appears that tips were typically less than $1,200 per day, *see* Dodson Decl. ¶ 31(3) (quoting WhatsApp messages from two days in August 2021 in which the total tips, apparently including both cash tips and tips left on credit cards, were $678.67 and $767.41, respectively). Moreover, Kargar's day rate was $120 throughout her employment at Farida, while Foster's day rate began at $120 and rose to $200. Pegging the tip award to each server's day rate would unfairly provide a larger award to the server with the higher day rate, without any evidence that the actual tips left by customers increased in proportion to their server's day rate. Consequently, adopting counsel's proposed formula would, in my view, result in an award that exceeds the "just and reasonable inferences" on which this Court is entitled to rely in estimating the amount and extent of an employee's uncompensated work. *Hernandez Gomez*, 769 F. App'x at 2 (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 69 (2d Cir. 1997)).

If the Kargar and Foster declarations are credited, it is clear that they were regularly deprived of their tips. It is also clear, however, that the amount withheld on any one day could be either below or above the $120 day rate that Kargar earned throughout her employment and that Foster earned at the beginning of her employment. Awarding each plaintiff damages in the amount of $120 per day worked for their unlawfully withheld tips is therefore a "just and reasonable" result," particularly given the difficulty of calculating a more precise figure. Applying that rate,

34

Foster should be awarded $18,960 in withheld tips ($120 × 158 shifts) and Kargar should be awarded $12,720 ($120 × 106 shifts).

### 5. Liquidated Damages

Finally, plaintiffs Foster and Kargar request liquidated damages in the amount of 100% of their actual unpaid minimum wages, unpaid overtime wages, unpaid spread of hours pay, and unlawfully withheld tips. *See* Prop. Findings at 22. As discussed above, under the NYLL, a defendant employer is liable for liquidated damages equal to the full amount of plaintiffs' unpaid wages, unless the employer can demonstrate that it acted in "good faith." NYLL § 198(1-a). Because a showing of good faith is an affirmative defense under NYLL § 198, a defaulted defendant cannot carry that burden. *See* NYLL § 198(1-b); *Tackie*, 2014 WL 4626229 at *4; *Jaramillo v. Banana King Rest. Corp.*, 2014 WL 2993450, at *5 (E.D.N.Y. July 2, 2014). Therefore, plaintiff Foster is entitled to $31,762.50 in liquidated damages and plaintiff Kargar is entitled to $21,150 in liquidated damages.

### 6. Offset for Prior Settlement

As noted above, each plaintiff has already received $14,000 from the Settled Defendants. *See* Cheeks Order at 2, 4-5. Consequently, their awards against the Defaulted Defendant should be reduced by the same amount, so as to prevent double recoveries on the same claims. *See, e.g., Koziar v. Blammo, Ltd.*, 759 F. Supp. 3d 543, 553 (S.D.N.Y. 2024) (subtracting the $25,000 plaintiffs "obtained via settlement" from their damages award); *Renaissance Search Partners v. Renaissance Ltd.*, 2014 WL 4928945, at *5 (S.D.N.Y. Oct. 1, 2014) ("Miller's payment to plaintiff of these compensatory damages is to be offset by any amounts paid to plaintiff by the other defendants pursuant to the Settlement Agreement."); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co. Inc.*, 2012 WL 1414872, at *9 (E.D.N.Y. Jan. 20, 2012)

(recommending that "the defaulting defendants' liability be reduced by $24,000, the total amount of the settlements"); *Siemieniewicz v. CAZ Contracting Corp.*, 2012 WL 5183375, at *16 (E.D.N.Y. Sept. 21, 2012) ("[T]he award against CAZ should properly be reduced by the $12,000 in compensation that Siemieniewicz has actually received from the other defendants[.]"), *adopted as modified*, 2012 WL 5183000 (E.D.N.Y. Oct. 18, 2012).

Plaintiffs acknowledge that an offset for the sums previously received from the Settled Defendants is appropriate, *see* Dodson Decl. ¶ 94, but argue that the offset should "be at a maximum only for amounts actually paid and received, not just owed." *Id*. While other courts have adopted this approach, *see, e.g.*, *Siemieniewicz*, 2012 WL 5183375, at *16, it has no application here, because plaintiffs do not claim (and certainly do not provide any evidence) that the Settled Defendants failed to pay any part of the consideration set forth in the Settlement. Accordingly, plaintiffs' damages awards should be offset by the full $14,000 they presumptively each received from the Settled Defendants.

### D.    Plaintiff Kargar's NYCHRL Damages

In addition to damages under the NYLL, plaintiff Kargar requests $138,986.70 in compensatory damages, $35,000 in emotional distress damages, and $50,000 in punitive damages arising from her sexual harassment claims against the Defaulted Defendant. Prop. Findings at 22. After carefully reviewing the relevant evidence, I conclude that she should be awarded $35,000 in emotional distress damages and $15,000 in punitive damages.

#### 1.    Compensatory Damages

Violations of the NYCHRL "entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering." *Moore v. Houlihan's Rest., Inc.*, 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011). Plaintiff Kargar seeks compensatory damages in the amount of $138,986.70,

36

because – she says – she had to reduce her work schedule for approximately two months due to defendant Kamolov's harassing conduct towards her. Specifically, Kargar attests that she "could not handle the toxic environment where [she] feared for [her] safety, and in particular between February and March of 2021, [she could] only work 3 days per week because [the Defaulted Defendant] was screaming at [her] in front of customers and could not control his behavior." Kargar Damages Decl. ¶ 9.

Kargar does not explain how a reduction in her work schedule for two months could result in lost wages of almost $139,000. Moreover, her declaration is inconsistent with her damages chart, which shows that she regularly worked five to six days per week during February and March 2021 (thereby entitling her to increased damages for unpaid overtime, spread of hours pay, and withheld tips during those months). *See* Kargar Damages Chart at ECF pp. 2-3. Because there is nothing in the record to explain this discrepancy, plaintiff should not be awarded any compensatory damages for pecuniary losses under the NYCHRL. *See Koutlakis*, 2024 WL 4250250, at *13 (declining to award damages based on inconsistent evidence); *Llolla*, 2014 WL 1310311, at *7 (same).

### 2.      Emotional Distress Damages

Kargar next requests emotional distress damages in the amount of $35,000. Prop. Findings at 22. Emotional distress damages are available under the NYCHRL on a claim of sexual harassment. *See Bergerson v. N.Y. Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 286 (2d Cir. 2011) (a plaintiff who prevails on a claim of sexual harassment under Title VII, the NYSHRL, or the NYCHRL may recover damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses"); *see*

*also Caravantes v. 53rd St. Partners, LLC*, 2012 WL 3631276, at \*22 (S.D.N.Y. Aug. 23, 2012) (same).

In the Second Circuit, emotional distress claims are frequently grouped into three categories: "garden-variety," "significant," and "egregious." *Caravantes*, 2012 WL 3631276, at \*22 (citing *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)). In "garden variety" emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes her injury in vague or conclusory terms, without any corroboration as to the severity or consequences of the injury. *Id.* Garden-variety emotional distress awards typically range from $30,000 to $125,000. *Id.; see also Bethel v. Royal Leaf NY LLC*, 2025 WL 3216640, at \*8 (S.D.N.Y. Oct. 9, 2025) (collecting cases), *adopted*, 2025 WL 3216413 (S.D.N.Y. Nov. 18, 2025); *Ravina v. Columbia Univ*., 2019 WL 1450449, at \*11 (S.D.N.Y. Mar. 31, 2019) (collecting cases).

Here, as her counsel admits, plaintiff Kargar "is claiming so-called 'garden variety' emotional distress damages." Nussbaum Decl. (Dkt. 111) ¶ 24. In her declaration, she states that Kamalov's lewd sexual comments and uninvited physical contact caused her to "fear[] for [her] safety" and to feel "ashamed" and "conflicted," even though she had not done anything wrong. *Id*. ¶¶ 9-10. Kargar does not provide any further details as to the nature or severity of her mental and emotional injuries. Nor does she claim to have suffered accompanying physical symptoms or required professional mental health treatment. Nonetheless, her declaration establishes that she is entitled to some amount of emotional distress damages. Considering the totality of the circumstances, I find her request for an award of $35,000 to be reasonable under the circumstances. *See, e.g.*, *Bethel*, 2025 WL 3216640, at \*9 (awarding $50,000 where plaintiff "attest[ed] she experienced uninvited physical contact, lewd sexual comments . . . sexual harassment, and

humiliation for the duration of her employment"); *Aponte v. Clinton St. Pizza Inc.*, 2024 WL 3796806, at \*10 (S.D.N.Y. July 19, 2024) (recommending $20,000 per plaintiff based on similar facts and evidence), *adopted*, 2024 WL 3794335 (S.D.N.Y. Aug. 13, 2024).

### 3.    Punitive Damages

Finally, plaintiff Kargar seeks an award of $50,000 in punitive damages. Prop. Findings at 22. Punitive damages are also available under the NYCHRL. N.Y.C. Admin. Code § 8-502(a). "[T]he standard for determining [punitive] damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 885 F.3d 122, 124 (2d Cir. 2018) (internal quotations and citation omitted). "This standard requires a lower degree of culpability than is required for punitive damages under other statutes, as it requires neither a showing of malice nor awareness of the violation of a protected right." *Kreisler v. Humane Soc'y of N.Y.*, 2018 WL 4778914, at \*9 (S.D.N.Y. Oct. 3, 2018) (internal quotations and citation omitted).

Defendant Kamolov's conduct, as described in the Complaint and in Kargar's declaration, meets the standard for punitive damages under the NYCHRL. Under New York law, whether to award punitive damages and how much to award are "primarily questions which reside in the sound discretion of the original trier of the facts," *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (Sotomayor, C.J., sitting by designation) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 445 (1978)), subject to constitutional limits.[11] Here,

---

[11] Excessive punitive damage awards could violate a defendant's right to due process. *Greenbaum*, 67 F. Supp. 2d at 269; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."). The recommended award in this case does not approach that line.

although there was no trial, I have considered the evidence submitted by Kargar in light of the factors relied on by courts reviewing punitive damages awards after trial. *See, e.g., Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (courts should consider the presence or absence of "[a]ggravating factors," including "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct."). I have also reviewed awards issued in comparable cases, recognizing, however, "that the comparison of punitive awards is 'of limited utility because each award is fact-specific.'" *Greathouse v. JHS Sec. Inc.*, 2015 WL 7142850, at *9 (S.D.N.Y. Nov. 13, 2015) (quoting *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011)), *adopted*, 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016).

As noted above, Kargar acknowledges that Kamolov touched her in an offensive manner on only "one occasion." Kargar Default Decl. ¶ 8. Nonetheless, that incident, together with his verbal harassment in the workplace, demonstrates that his conduct was neither inadvertent nor trivial, but instead willful and malicious. Moreover, a restaurant manager does not need a law degree to know that approaching a server from behind in the workplace and reaching around her to grab her breasts violates that server's rights. In short, Kamolov's conduct exceeds the minimum threshold for punitive damages under the NYCHRL. I therefore recommend that plaintiff be awarded an additional $15,000 in punitive damages, against the Defaulted Defendant, on her NYCHRL claim. *See Castillo v. Isakov*, 2024 WL 5323851, at *14 (S.D.N.Y. Dec. 27, 2024) (recommending $25,000 in garden-variety emotional distress damages and $15,000 in punitive damages), *adopted*, 2025 WL 89048 (S.D.N.Y. Jan. 14, 2025); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 101 (E.D.N.Y. 2020) (collecting cases and noting that "[i]n sexual assault

cases, courts in this Circuit frequently award punitive damages that are equal to or less than compensatory damages.").

E.      Attorneys' Fees and Costs

As plaintiffs correctly point out, both the FLSA and the NYLL are "fee shifting statutes that entitle the prevailing party to recover [her] reasonable attorneys' fees and costs." Prop. Findings at 21; *see also* 29 U.S.C. § 216(b); NYLL §§ 198(1-a), 663(4).[12] In the Scheduling Order, this Court directed plaintiffs to submit admissible evidence concerning "all damages and other monetary relief permitted in connection with a default judgment against the Defaulting Defendant," including attorneys' fees. Sched. Order ¶¶ 1, 5, 6. The Court further directed plaintiffs to support any request for attorneys' fees with "contemporaneous time records authenticated by counsel and showing, for each attorney or other timekeeper, the date of service, the hours expended, the hourly rate charged (if applicable), and the nature of the work performed. Plaintiffs must also submit admissible evidence identifying each attorney or other timekeeper and describing his or her background and qualifications, as well as evidence documenting plaintiffs' costs and expenses." *Id*. ¶ 5.

Plaintiffs were represented in this litigation by, among others, attorney Dodson of AndersonDodson. In their inquest materials, plaintiffs point to the AndersonDodson billing records that they submitted a month earlier when seeking approval of their Settlement, which – they say – reflect a "combined 195.7 hours totaling $51,444 of combined efforts" at the firm's stated billing rates, which range from $475 per hour for partners to $45 for paralegals performing what appear to be clerical tasks. *See* Prop. Findings at 22; Dodson Decl. ¶ 93; Billing Records (Dkt. 176-4). Additionally, plaintiffs submit a copy of a declaration previously filed by attorney

---

[12] The NYCHRL is also a fee-shifting statute. *See* N.Y.C. Admin. Code § 8-502(g).

Dodson (in support of a fee motion made in an unrelated case entitled *Bray v. New York General Gypsum Floors Inc*.) because it sets out the "[e]xperience of counsel." Dodson Decl. ¶ 93; *see also* Dodson Att'y Fee Decl. (Dkt. 183-16) ¶¶ 3-12. On this basis, plaintiffs appear to request a fee award of $51,444. Confusingly, however, they also advise the Court that upon entry of a judgment they will "ask for leave to submit a motion for attorney's fees and costs[.]" Dodson Decl. ¶ 95.

As the Scheduling Order made clear, plaintiffs were required to submit the evidence necessary to support their requested fee award along with the rest of their inquest materials. Consequently, I have determined their appropriate award based upon the record as it now exists. *See Jianhui Hu v. 226 Wild Ginger*, 2020 WL 4383501, at *4 (S.D.N.Y. July 31, 2020) (denying plaintiffs' post-judgment motion for a fee award because they "had a full opportunity to substantiate their request for attorney's fees and costs before the Magistrate Judge at the inquest," but failed to submit the necessary evidence at that time); *Elisama*, 2016 WL 11523365, at *17 (recommending fee award based on limited evidence available in record at time of inquest, despite plaintiff's counsel's failure to comply with judicial directions regarding evidentiary support for fee request).

To determine the "presumptively reasonable fee" due to a prevailing plaintiff, the court multiplies the hours counsel reasonably spent on the litigation by a reasonable hourly rate. *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)). "The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotations omitted).

### 1.    Reasonable Hourly Rate

In determining a reasonable hourly rate, a federal district court may consider, among other factors, "the prevailing market rates in the relevant community," the "customary billing rate charged by the attorney," and the Court's "own knowledge of comparable rates charged by lawyers in the district." *Munson v. Diamond*, 2017 WL 4863096, at *10 (S.D.N.Y. June 1, 2017) (citation omitted). The court may also consider "the degree of success, the quality of the legal services provided, the makeup of the firm doing the work, and the years of experience of each attorney at the bar as well as in the specialty being litigated." *Id*.

Courts in this District typically award fees ranging from $250 to $450 per hour for experienced litigators in wage-and-hour cases. *See Ke v. J R Sushi 2 Inc.*, 2024 WL 1891195, at *3 (S.D.N.Y. Apr. 30, 2024) (collecting cases). Attorney Dodson attests that she has been practicing employment law almost exclusively since 2003, and co-founded her own employment law firm in 2012, pursuing cases in New York, Colorado, and Georgia. Dodson Att'y Fee Decl. ¶¶ 5, 12. Her requested rate, which is $450 per hour, is reasonable for a lawyer in this District with more than twenty years of employment litigation experience. *See, e.g.*, *Ramirez v. Sake II Japanese Rest., Inc.*, 2023 WL 3354881, at *10 (S.D.N.Y. Apr. 24, 2023) (recommending hourly rate of $450 for attorney with 15 years of experience), *adopted*, 2023 WL 3346768 (S.D.N.Y. May 10, 2023); *Newman v. ASA Coll., Inc.*, 754 F. Supp. 3d 521, 546 (S.D.N.Y. 2024) (collecting cases and approving hourly rate of $400 for attorney with 11 years of experience). $450 per hour is also reasonable for Dodson's law partner, Christopher Anderson, who has been practicing law since 1996. *See* Dodson Att'y Fee Decl. ¶ 14.

Plaintiffs seek fees for work performed by AndersonDodson's non-attorney staff at the following rates: (a) $95 per hour for client relations specialist Billy Hernandez; (b) $45 or $150

per hour for paralegal Callyn Carter, apparently depending on the tasks being performed; (c) $175 per hour for paralegal Jess Velez; and (d) $45, $175, or $195 per hour for paralegal Jessica Balint, apparently depending on the tasks being performed. Hernandez joined the firm in August 2021 as a bilingual (Spanish/English) client relations specialist and "paralegal support." Dodson Att'y Fee Decl. ¶ 19. No further background information is provided for Hernandez.[13] Carter graduated from college with a degree in communications in 2021, and joined AndersonDodson in July 2021 as a paralegal. *Id*. ¶ 17. Velez received a paralegal certificate in 2016, obtained a B.A. in political science and social justice in 2019, and began working for AndersonDodson in the fall of 2020. *Id*. ¶ 16. Plaintiffs do not provide any information about Balint.

In wage and hour cases, courts in this District typically award $100-150 for work by paralegals, depending on experience. *See, e.g.*, *Garzon v. Bldg. Servs. Inc.*, 2025 WL 1871171, at *19 (S.D.N.Y. July 2, 2025) (collecting cases and recommending $100 per hour for paralegal where no pedigree information was provided), *adopted*, 2025 WL 2062741 (S.D.N.Y. July 23, 2025). Lower hourly rates are appropriate for other legal support staff. *See*, *e.g*., C*hen v. Lilis 200 W. 57th Corp.*, 2023 WL 9955610, at *10 (S.D.N.Y. Nov. 30, 2023) (recommending $75 per hour for "managing clerk" who "performed – at best – paralegal work on this case"), *adopted,* 2024 WL 749619 (S.D.N.Y. Feb. 23, 2024); *De La Cruz Rosas v. Just Salad 60 Third LLC*, 2023 WL 5423982, at *10 (S.D.N.Y. Aug. 4, 2023) (recommending $75 per hour for law school graduate working as translator), *adopted sub nom. Rosas v. Just Salad 600 Third LLC*, 2023 WL 5390985 (S.D.N.Y. Aug. 22, 2023). "With respect to tasks that are 'purely clerical,' such as downloading, scanning, or copying documents and organizing files, such work is generally not compensable,

---

[13] Nor is there any indication in the record of this action that the services of a bilingual staff member were required.

whether performed by an attorney or a paralegal." *Siegel v. Bloomberg L.P.*, 2016 WL 1211849, at \*7 (S.D.N.Y. Mar. 22, 2016) (collecting cases).

Here, I recommend a reduction of Hernandez's rate to $75 per hour; a reduction in Carter's rate to $125 per hour (for her paralegal work); and a reduction in Velez's rate to $150 per hour. As to Balint, a more significant reduction is warranted – to $100 per hour (for her paralegal work), since there is no information in the record as to her background or experience. *See Garzon*, 2025 WL 1871171, at \*19; *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 29 (S.D.N.Y. 2015) ("[C]ourts are generally more skeptical of requested hourly rates when the applicant fails to provide information about the backgrounds of the relevant attorneys and paralegals."). Absent such information, a rate of $100 is appropriate for Balint. I recommend that no award be made for the tasks that Carter and Balint performed at the stated rate of $45 per hour, which appear to be "purely clerical" in nature. *See*, *e.g*., Billing Records at ECF p. 1 ($45 per hour for "general admin" tasks such as rescheduling a meeting and "open matter tasks"); *id*. at ECF p. 7 ($45 per hour for "mail processing" tasks).

### 2. Number of Hours

I next turn to whether the hours expended by AndersonDodson were reasonable. An application for attorneys' fees must include "contemporaneous time records" that specify "the date, the hours expended, and the nature of the work done." *Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (citation omitted). The Court may "reduce hours 'where the attorney's proffered time records are vague or otherwise inadequate to enable the court to determine the reasonableness of the work performed or the time expended.'" *Chen*, 2023 WL 9955610, at \*5 (quoting *Wen v. Hair Party 24 Hours Inc.*, 2021 WL 3375615, at \*14 (S.D.N.Y. May 17, 2021)), *adopted*, 2024 WL 749619 (S.D.N.Y. Feb. 23, 2024). "However, because '[t]he essential goal in shifting fees . . . is to do rough

justice, not to achieve auditing perfection,' courts 'need not, and indeed should not, become green-eyeshade accountants.'" *Id.* (summary order) (alteration in original) (quoting *Hines v. City of Albany*, 613 F. App'x 52, 54 (2d Cir. 2015)). Accordingly, district courts have "discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" *Id.* (quoting *Hines*, 613 F. App'x at 54-55).

Here, plaintiffs have submitted sixteen pages of AndersonDodson time records, listing a total of 199.2 hours billed in this action,[14] including 73 attorney hours[15] and 126.2 paralegal hours.[16] Of the paralegal hours, 17.1 hours were billed on purely clerical tasks, at $45 per hour, and should be excluded from any fee award against the Defaulted Defendant.

Of the remaining 182.1 hours, approximately 17% (31.6 hours, by this Court's count) reflect work performed to pursue (or settle) plaintiffs' claims against the Settled Defendants. These hours should also be excluded from any fee award against the Defaulted Defendant. *See Poulos v. City of New York*, 2018 WL 3750508, at *11 (S.D.N.Y. July 13, 2018) (after default, "plaintiff's counsel is only entitled to those fees that are reasonably attributable to plaintiffs' claims against [the defaulted defendant]"), *adopted*, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018); *Lucerne Textiles, Inc. v. H.C.T. Textiles Co.*, 2013 WL 174226, at *9 (S.D.N.Y. Jan. 17, 2013) (defaulted defendant "is not responsible for fees related to [plaintiff's] claims against other parties"), *adopted*, 2013 WL 1234911 (S.D.N.Y. Mar. 26, 2013).

---

[14] *Cf.* Dodson Decl. ¶ 93 (erroneously stating that the Billing Records showed 195.7 hours).

[15] All of the attorney hours were billed by Dodson except for one-tenth of one hour, which was billed by her partner, Anderson, to "[d]iscuss settlement strategy." Billing Records at ECF p. 15. As discussed below, plaintiffs are not entitled to any fee award against the Defaulted Defendant with respect to time spent pursuing a settlement with other defendants.

[16] *Cf.* Billing Records at ECF p. 13 (erroneously stating that the total paralegal hours amount to 121.7).

Another 144.6 hours, by this Court's count, appear to reflect tasks pertaining to all defendants jointly, and therefore should be reduced by a significant percentage for purposes of calculating the appropriate award against the Defaulted Defendant. *See Dixon v. Agbai*, 2016 WL 3702749, at \*18 (S.D.N.Y. July 8, 2016) (reducing fee award because "a significant amount of time relates to the case against all defendants and not just to the litigation against [the defaulted defendant]"), *adopted*, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016); *Marvici v. Roche Facilities Maint. LLC*, 2023 WL 5810500, at \*13 (S.D.N.Y. Sept. 8, 2023) (collecting cases and concluding that "where attorneys seek fees that were billed for services related to both non-defaulting and defaulting defendants, such mixed fees should be reduced by a percentage"), *adopted*, 2023 WL 6648902 (S.D.N.Y. Oct. 12, 2023). Here, since plaintiffs settled with three of the four suable defendants, a 75% reduction of the mixed hours, to 36.15 hours, would be appropriate.[17]

The remaining 9.9 hours were billed by attorney Dodson (6.9 hours) and paralegal Balint (3 hours) in connection with the instant default proceedings and are properly awarded against the Defaulted Defendant. As shown in the chart below, the total time "reasonably spent" on plaintiffs' claims against defendant Kamolov was 46.05 hours. Multiplying the total time "reasonably spent" by each timekeeper by his or her reasonable hourly rate, the presumptively reasonable fee award in this case is **$11,611.88**:

---

[17] Although the caption of this action lists a total of six defendants, I am disregarding Umka and Farida Online purposes of apportioning fees. As noted above, Umka and Farida Online do not exist in corporate form and (perhaps for that reason) were not formally parties to the Settlement. Since the Settlement, plaintiffs appear to have abandoned their claims against Umka and Farida Online.

| Timekeeper | Reas. Rate | 25% of Reas. Hours Spent as to All Defs. | Reas. Hours Spent as to Defaulted Def. | Total Hours | Total Award |
|---|---|---|---|---|---|
| Dodson | $ 450 | 12.125 | 6.9 | 19.025 | $ 8,561.25 |
| Hernandez | 75 | 0.15 | 0 | 0.15 | 11.25 |
| Carter | 125 | 1.275 | 0 | 1.275 | 159.38 |
| Velez | 150 | 6.4 | 0 | 6.4 | 960.00 |
| Balint | 100 | 16.2 | 3 | 19.2 | 1,920.00 |
| **Totals** | | 36.15 | 9.9 | 46.05 | $ **11,611.88** |

## IV.    CONCLUSION

For the foregoing reasons, I recommend, respectfully, that plaintiffs be awarded:

(1) **$49,525** in damages to plaintiff Foster ($31,762.50 in compensatory damages under the NYLL, plus $31,762.50 in liquidated damages under the NYLL, minus $14,000 in previous settlement proceeds on the same claims);

(2) **$78,300** in damages to plaintiff Kargar ($21,150 in compensatory damages under the NYLL, $21,150 in liquidated damages under the NYLL, $35,000 in emotional distress damages under the NYCHRL, and $15,000 in punitive damages under the NYCHRL, minus $14,000 in previous settlement proceeds on the same claims);

(3) **$11,611.88** in attorneys' fees with respect to the claims of plaintiffs Foster and Kargar against the Defaulted Defendant; and

(4) post-judgment interest at the federal statutory rate pursuant to 28 U.S.C. § 1961.

Finally, I recommend that plaintiff Diaz's claims be DISMISSED as against all defendants, for failure to substantiate any damages, and that any remaining claims against Umka and Farida Online be DISMISSED for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

Dated: New York, New York
      December 16, 2025

**BARBARA MOSES**
**United States Magistrate Judge**

48

## <u>NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS<br>REPORT AND RECOMMENDATION</u>

The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), unless they receive this Report and Recommendation solely by mail, in which case they have 17 days from the date on which it was mailed. *See* Fed. R. Civ. P. 6(a), 6(d). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Jesse M. Furman, and delivered to Judge Furman in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Furman. Failure to file timely objections will result in a waiver of such objections and will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Appendix 1: Foster Unpaid Minimum and Overtime Wages**

| Week | Start Date | Shifts | Reg. Hours | OT Hours | Day Rate | Weekly Pay | Regular Rate | OT Rate | MW Owed | OT Owed |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6/28/2021 | 1 | 12 | 0 | $ 120.00 | $ 120.00 | $ 10.00 | $ 22.50 | $ 60.00 | $ 0.00 |
| 2 | 7/5/2021 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 120.00 | 180.00 |
| 3 | 7/12/2021 | 1 | 12 | 0 | 120.00 | 120.00 | 10.00 | 22.50 | 60.00 | 0.00 |
| 4 | 7/19/2021 | 1 | 12 | 0 | 120.00 | 120.00 | 10.00 | 22.50 | 60.00 | 0.00 |
| 5 | 7/26/2021 | 2 | 24 | 0 | 150.00 | 300.00 | 12.50 | 22.50 | 60.00 | 0.00 |
| 6 | 8/2/2021 | 5 | 40 | 20 | 150.00 | 750.00 | 18.75 | 28.13 | 0.00 | 562.50 |
| 7 | 8/9/2021 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 8 | 8/16/2021 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 9 | 8/23/2021 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 10 | 8/30/2021 | 2 | 24 | 0 | 200.00 | 400.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 11 | 9/6/2021 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 12 | 9/13/2021 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 13 | 9/20/2021 | 1 | 12 | 0 | 200.00 | 200.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| | | | | | *Break in employment* | | | | | |
| 14 | 12/6/2021 | 4 | 40 | 8 | $ 200.00 | $ 800.00 | $ 0.00 | $ 30.00 | $ 0.00 | $ 240.00 |
| 15 | 12/13/2021 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 16 | 12/20/2021 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 17 | 12/27/2021 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 18 | 1/3/2021 | 2 | 24 | 0 | 200.00 | 400.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 19 | 1/10/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 20 | 1/17/2022 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 21 | 1/24/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 22 | 1/31/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 23 | 2/7/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 24 | 2/14/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 25 | 2/21/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |

| | | | | | | | Appendix 1: Foster Unpaid Minimum and Overtime Wages | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | Start Date | Shifts | Reg. Hours | OT Hours | Day Rate | Weekly Pay | Regular Rate | OT Rate | MW Owed | OT Owed |
| 26 | 2/28/2022 | 3 | 36 | 0 | $ 200.00 | $ 600.00 | $ 16.67 | $ 25.00 | $ 0.00 | $ 0.00 |
| 27 | 3/7/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 28 | 3/14/2022 | 3 | 36 | 0 | 200.00 | 600.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 29 | 3/21/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 30 | 3/28/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 31 | 4/4/2022 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 32 | 4/11/2022 | 3 | 36 | 0 | 200.00 | 0.00 | 16.67 | 25.00 | 0.00 | 0.00 |
| 33 | 4/18/2022 | 4 | 40 | 8 | 200.00 | 0.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 34 | 4/25/2022 | 4 | 40 | 8 | 200.00 | 0.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 35 | 5/2/2022 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 36 | 5/9/2022 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 37 | 5/16/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 38 | 5/23/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 39 | 5/30/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 40 | 6/6/2022 | 5 | 40 | 20 | 200.00 | 1,000.00 | 25.00 | 37.50 | 0.00 | 750.00 |
| 41 | 6/13/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 42 | 6/20/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 43 | 6/27/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 44 | 7/4/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| 45 | 7/11/2022 | 4 | 40 | 8 | 200.00 | 800.00 | 20.00 | 30.00 | 0.00 | 240.00 |
| Totals | | | | | | | | | $ 360.00 | $ 10,072.50 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Appendix 2: Kargar Unpaid Overtime Wages** | | | | | | | | | |
| **Week** | **Start Date** | **Shifts** | **Reg Hours** | **OT Hours** | **Day Rate** | **Weekly Pay** | **Regular Rate** | **OT Rate** | **OT Owed** |
| 1 | 9/7/2020 | 3 | 36 | 0 | $ 120.00 | $ 360.00 | $ 10.00 | $ 22.50 | $ 0.00 |
| 2 | 9/14/2020 | 3 | 36 | 0 | 120.00 | 360.00 | 10.00 | 22.50 | 0.00 |
| 3 | 9/21/2022 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 4 | 9/28/2022 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 5 | 10/5/2020 | 3 | 36 | 0 | 120.00 | 360.00 | 10.00 | 22.50 | 0.00 |
| 6 | 10/12/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 7 | 10/19/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 8 | 10/26/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 9 | 11/2/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 10 | 11/9/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 11 | 11/16/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 12 | 11/23/2020 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 13 | 11/30/2020 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 14 | 12/7/2020 | 2 | 24 | 0 | 120.00 | 240.00 | 10.00 | 22.50 | 0.00 |
| 15 | 12/14/2020 | 1 | 12 | 0 | 120.00 | 120.00 | 10.00 | 22.50 | 0.00 |
| 16 | 12/21/2020 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 17 | 12/28/2020 | 3 | 36 | 0 | 120.00 | 360.00 | 10.00 | 22.50 | 0.00 |
| 18 | 1/4/2021 | 5 | 40 | 20 | 120.00 | 600.00 | 15.00 | 22.50 | 450.00 |
| 19 | 1/11/2021 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 20 | 1/18/2021 | 5 | 40 | 20 | 120.00 | 600.00 | 15.00 | 22.50 | 450.00 |
| 21 | 1/25/2021 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 22 | 2/1/2021 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 23 | 2/8/2021 | 4 | 40 | 8 | 120.00 | 480.00 | 12.00 | 22.50 | 180.00 |
| 24 | 2/15/2021 | 6 | 40 | 32 | 120.00 | 720.00 | 18.00 | 27.00 | 864.00 |
| 25 | 2/22/2021 | 6 | 40 | 32 | 120.00 | 720.00 | 18.00 | 27.00 | 864.00 |
| 26 | 3/1/2021 | 6 | 40 | 32 | 120.00 | 720.00 | 18.00 | 27.00 | 864.00 |
| 27 | 3/8/2021 | 6 | 40 | 32 | 120.00 | 720.00 | 18.00 | 27.00 | 864.00 |
| 28 | 3/15/2021 | 6 | 40 | 32 | 120.00 | 720.00 | 18.00 | 27.00 | 864.00 |
| 29 | 3/22/2021 | 3 | 36 | 0 | 120.00 | 360.00 | 10.00 | 22.50 | 0.00 |
| **Totals** | | | | | | | | | **$ 6,840.00** |